# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-1815V
UNPUBLISHED

| | |
|---|---|
| SUZANNE DEGEORGE,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: May 13, 2021<br><br>Special Processing Unit (SPU);<br>Findings of Fact; Onset; Influenza<br>(Flu) Vaccine; Shoulder Injury<br>Related to Vaccine Administration<br>(SIRVA) |

*John Richard Taylor*, Zaytoun Law Firm, Raleigh, NC, for petitioner.

*Amanda Pasciuto*, U.S. Department of Justice, Washington, DC, for respondent.

## **FINDINGS OF FACT**[1]

On November 27, 2018, Suzanne DeGeorge filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") and/or adhesive capsulitis as a result of an influenza ("flu") vaccine received on October 6, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

A fact hearing to determine disputed issues relating to Petitioner's Table claim was held on February 12, 2021. For the reasons discussed below, I find the onset of Petitioner's left shoulder pain occurred within 48 hours of vaccination.

## I.     Relevant Procedural History

As noted above, the case was initiated in November 2018. On April 23, 2020, Respondent filed his Rule 4(c) Report (ECF No. 30) and an accompanying Motion to Dismiss (ECF No. 31). Respondent specifically maintained that the evidence preponderated against a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of her vaccination. *Id*. at 6-7. Respondent also argued that Petitioner had experienced pre-vaccination symptoms and/or diagnoses that could explain her post-vaccination signs and symptoms. *Id*. For these reasons, Respondent asserted that Petitioner could not meet the requirements for a "Table" SIRVA claim. *Id*. Respondent further asserted that Petitioner also had not provided evidence sufficient to establish causation-in-fact under any of the *Althen* prongs. *Id*. at 7-8.[3]

On July 17, 2020, Petitioner filed a Memorandum in Opposition to Respondent's Motion to Dismiss (ECF No. 34) and additional evidence in support of her claim (ECF No. 33). On July 29, 2020, Respondent filed a Reply to Petitioner's Memorandum in Opposition to Respondent's Motion to Dismiss. ECF No. 35. On September 30, 2020, I conducted a status conference and indicated that the critical issue to resolve in this case was whether Petitioner has established that her shoulder pain began within the 48-hour period required to establish a SIRVA Table case. (ECF No. 36). In order to make that determination, I advised I would like to hear testimony from Petitioner's treating physician, since (as discussed in greater detail below) a medical record the physician created was highly relevant to the disputed fact issue. *Id.*

After allowing for the filing of additional medical records (ECF Nos. 39, 41) and determining that the parties could not resolve this case informally (ECF No. 43), an onset hearing was scheduled for February 12, 2021, and was held on that date by video conference (ECF Nos. 42, 48); Minute Entry dated February 12, 2021; Transcript filed March 18, 2021 (ECF No. 51).

---

[3] To be successful on a causation-in-fact claim, a petitioner must show preponderant evidence of "(1) a medical theory causally connecting the vaccination to the injury; (2) a logical sequence of cause and effect showing the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between the vaccination and the injury." *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

**II.     Issue**

At issue is whether Petitioner's first symptom or manifestation of injury onset (specifically pain) occurred within 48 hours of vaccine administration, as set forth in the Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a)(XIV)(B) (2017) (influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

**III.    Authority**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs*, 23 Cl. Ct. 726, 733 (1991) (quoting with approval the standard used by the special master below), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record. *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.    Finding of Fact

I make my finding on the onset of Petitioner's injury after a complete review of the record to include all medical records, affidavits, respondent's Rule 4 report, the parties' briefs, hearing testimony, and additional evidence filed. I have fully reviewed and considered all evidence and the parties' briefing in this matter, however for the purpose of brevity I do not summarize and/or address all records, testimony, or arguments put forward.

Specifically, I rely upon on the following evidence.

### A. Medical Records

- Ex. 4 at 4, documenting that a flu vaccine was administered intramuscularly into Petitioner's left deltoid on October 6, 2017.

- Ex. 5 at 46-58, a record of Petitioner's November 21, 2017 MinuteClinic appointment for pneumonia, making no reference to Petitioner's left shoulder pain, and indicating a "normal range of motion" in association with a musculoskeletal examination.

- Ex. 5 at 59-61, a record of Petitioner's February 1, 2018 appointment with her primary care physician, Dr. Laura Seth, for a physical examination, making no reference to Petitioner's left shoulder pain, despite containing ample reference to Petitioner's overall health status.

- Ex. 8 at 372-384, a record of Petitioner's October 1, 2018 appointment Dr. Naumann for an annual gynecologic/well-woman examination, without reference to Petitioner's left shoulder.

- Ex. 26 at 1, a record of Petitioner's first physical therapy session on October 8, 2018 for pain in her left arm.

- Ex. 2 at 2, Ex. 26 at 9, a record of Petitioner's October 22, 2018 physical therapy session for her left shoulder, reporting that she received a flu shot one year prior and experienced left shoulder pain that "has never gotten better."

- Ex. 3 at 2, a record of Petitioner's October 24, 2018 orthopedics visit with Jeffrey Dabkowski, PA-C, recording a chief compliant of left shoulder pain following flu shot and providing a detailed history as follows:

  > This is a 53-year-old female here today for evaluation of her left shoulder. She received a flu shot in her left shoulder about a year ago. She says that flu shot had hurt more than usual at the time and she does remember the injection being quite high in her shoulder. She points directly underneath her acromion. The acute pain got better over a week but then she continued to have severe pain while getting dressed. . . . She says the pain was originally through her deltoid but then grew to encompass her entire shoulder over the course of the year. She started physical therapy 3 weeks ago and has made great progress and feels like she is now back on the right track.

5

> Ex. 3 at 2. Mr. Dabkowski found that Petitioner had reduced range of motion on examination and assessed her with left shoulder pain and adhesive capsulitis. *Id.* at 2-3.

- Ex. 16, a corrected acupuncture record from a December 3, 2018 visit, reporting Petitioner had "[h]urt her left shoulder."  (ECF No. 28-4).

    - Ex. 20, a sworn declaration from Petitioner's acupuncturist, Charles Hipple, executed July 14, 2020 (at Respondent's request[4]), explaining why he corrected Petitioner's December 3, 2018 medical record[5] and indicating that throughout his treatment of Petitioner "she always attributed her shoulder injury solely to her 2017 influneza vaccination. Having treated other patients with similar vaccine-related shoulder injuries, my observation and treatment of Ms. DeGeorge indicate that her shoulder injury was caused by administration of the vaccine." *Id.* at ¶5.

- Ex. 9 at 7, a physical therapy evaluation at OrthoCarolina on February 4, 2019, recording an

    > Explanation of Onset and Reason for Skilled Therapy: P[atien]t with onset of arm pain after a flu shot in 2017. She noticed increased arm pain which was unusual and says the pain never totally went away. The pain was nagging and had difficulty with dressing herself. Last summer the pain worsened with reaching forward and was told she had frozen shoulder in October 2018.

### B. Letter from Petitioner's Treating Physician

Additionally, Petitioner offered a letter from Dr. Seth (her primary care doctor for over ten years), dated April 2, 2019. The letter provides a brief overview of the history Petitioner's left shoulder injury and treatment. Dr. Seth indicates in her letter that Petitioner's

---

[4] Prior to being corrected, Petitioner's December 3, 2018 acupuncture record indicated that Petitioner was in a car accident. Respondent, in his Rule 4 Report requested a certified copy of Petitioner's acupuncture records and a sworn statement "attesting to any deletions in those records." Respondent's Rule 4 Report at 4 n.2.

[5] Mr. Hipple explained that the notation in the original record, indicating that Petitioner was in a car accident, was not accurate and related to another patient. Ex. 20, ¶¶3-4.

6

> shoulder problems originated in late 2017, and when I saw her a few months later at her physical exam [on February 1, 2018], she mentioned her shoulder was still painful after having a flu shot administered in October at her workplace. I felt this was likely shoulder injury related to flu vaccine. She unfortunately then developed significant adhesive capsulitis and despite physical therapy, massage, and acupuncture as well as a steroid injection, it has still not resolved. She is continuing physical therapy at this time.

Ex. 6. The letter did not, however, explain why the February 2018 physical exam record made no reference to Petitioner's purported SIRVA injury from four months prior.

### C. Hearing Testimony

The February 2021 hearing featured testimony from Petitioner, Petitioner's husband, Richard DeGeorge, and Dr. Seth.

1. Testimony of Petitioner

Ms. DeGeorge testified the flu vaccine she received on October 6, 2017, was "immediately very, very painful and I thought it was strange and weird." Tr. at 61. She had received the vaccine at the school where she worked as an administrative assistant, and her arm continued to hurt as she walked back from the place she received it to her office. She did not, however, discuss her pain with anyone else at the school, as she "was just feeling really embarrassed that I had pain from a flu shot," (Tr. at 61-62), elaborating on cross-examination that the students at her school received flu shots on "vaccine days" and never complained, so she "certainly [was] not going to be one to complain about a flu shot to anyone." *Id*. at 75.

Ms. DeGeorge's pain continued that evening when she returned home, and she told her husband (at the time her fiancé) about it. Tr. at 62. The shoulder pain was not as intense the next day, but it did persist. *Id.* at 63. She did not immediately seek treatment for her shoulder, however, because she could not "imagine that anybody would ever have to go to a doctor because of a flu shot. It didn't even occur to me and I figured it would get better." *Id.* at 63. Petitioner acknowledged on cross-examination that she did not report shoulder pain at her November 21, 2017 MinuteClinic visit, and although she did not initially recall the reason for the visit, Petitioner testified she would "never have mentioned shoulder pain or any other orthopedic pain to anyone at MinuteClinic." *Id*. at 75-76.

7

Petitioner maintained in her testimony that she did in fact inform Dr. Seth at the February 1, 2018 physical exam of her shoulder pain, even though the medical record of the visit is totally silent on the matter. Tr. at 63-64. Petitioner indicated that her appointment with Dr. Seth was otherwise a normal physical, "except that I wanted to make a point about asking her about my shoulder because it had been . . . several months now" and she wanted to get Dr. Seth's opinion. *Id*. at 64. As Ms. DeGeorge recalled, Dr. Seth advised her that the pain "would probably go away and I was encouraged by that, but it never did go away. In fact, it got worse by the summer." *Id*.

Petitioner testified that thereafter she did not seek additional treatment for her shoulder because she felt reassured by Dr. Seth, a "great doctor," and she had no reason to think she needed to see another doctor as she was "hopeful it would go away." Tr. at 64. But her shoulder pain continued to get worse, such that by the fall of 2018 she sought physical therapy and then orthopedic treatment from Jeff Dabkowski, PA. *Id.* at 65.

2.  Testimony of Richard DeGeorge, Esq.

Richard DeGeorge, Petitioner's husband and an attorney since 1986, testified that on October 6, 2017 – the date of Petitioner's vaccination – he and Petitioner were engaged and spent most nights together. Tr. at 46-47. Mr. DeGeorge recalls the night of October 6, 2017 because Petitioner

> complained about how sore her shoulder was. She had had her flu shot that day at work and I remember it so clearly because of how unusual it was for Suzanne to complain about something like that. She's generally pretty private, particularly about medical things, and she's just not a complainer. So I remember that night because she was really in pain and complained.

Tr. at 47.

Thereafter, "in the weeks and months after the flu shot, the pain just never went away." Tr. at 48. Mr. DeGeorge recalled that some days were better than others, but there were a number of days "where I needed to actually help her get dressed in the morning because of how painful it was for her to reach around to put on a blouse or her bra." *Id*. On cross-examination, Mr. DeGeorge testified that in the weeks immediately following Petitioner's vaccination, as she remained in pain, he "encouraged her to . . . see somebody about it [the pain] and she was reluctant to do that because she was embarrassed." *Id*. at 53. Mr. DeGeorge indicated that Petitioner eventually decided she would discuss the pain with Dr. Seth at her upcoming annual physical. Tr. at 53.

3.     Testimony of Laura Seth, MD

Dr. Seth is a board-certified internist who has been practicing in her specialty for 28 years, and has been Petitioner's primary care physician for at least 12 years. Tr. at 6, 10.

Dr. Seth affirmatively recalled that Petitioner reported left shoulder pain associated with her October 2017 vaccination at the February 1, 2018 physical examination. Tr. at 13. But she did not document Petitioner's report because it was a very "typical" complaint, and thus in Dr. Seth's view not something that she felt necessitated memorializing in Petitioner's wellness visit record. *Id*. Dr. Seth also recalled that at that appointment she advised Petitioner that "it was common to have some vaccine reaction that would lead to pain in the shoulder and that likely it would resolve on it its own pretty quickly." *Id*. On cross-examination Dr. Seth elaborated that "every single patient that comes in . . . for a wellness visit or physical has some kind of musculoskeletal complaint," but she tries to focus the annual physical on preventive issues, and "if I don't feel it's necessarily pertinent to their long-term health or longevity, I don't always comment" on a complaint. *Id*. at 38.

Dr. Seth's testimony also elaborated on her later statements regarding the impact of Petitioner's vaccination on her health. Dr. Seth recalled that at some point – possibly Petitioner's January 14, 2019 physical examination – she had a further conversation with Petitioner regarding the evolution of her shoulder pain. Tr. at 30-32. They discussed that the pain had worsened rather than resolved, and went on for "months and months after her vaccination." *Id*. at 31. Dr. Seth recalled that this conversation lead her to recommend that Petitioner receive future vaccinations in her leg, "because the vaccine had seemed to be at least temporally related to when she started having her shoulder pain," and she wanted to avoid Petitioner "having complications or further problems with the shoulder." *Id*.

Finally, Dr. Seth explained the circumstances surrounding the creation of the letter she had prepared that Petitioner filed. The letter was written after the afore-mentioned conversation with Petitioner, as Dr. Seth "agreed that likely this [shoulder injury] was a result of the vaccine and that I would write a letter so that would be documented in the medical record." Tr. at 32. Dr. Seth again reiterated the reason she believed the exam record made no mention of shoulder pain, asserting that

> problems often, when they first present, you consider mild or maybe not worthy of [] documentation. But when you look back over a course of time, you make the connection or recognition that a problem has resulted from

9

an event that happened perhaps years or months in the past. And so, at that point, I thought it was perhaps best to have some documentation in the record.

*Id*. at 32-33.

### D.  Onset Finding and Discussion

The above medical records, testimony, and other evidence preponderantly support a finding that Petitioner experienced left arm pain within 48 hours of vaccine administration. To be sure, this fact finding leaves considerable room for doubt – but Program petitioners are not required to establish facts or other disputed issues to a certainty, and the showing herein just crosses the "more likely than not" line.

The reason onset was so difficult to resolve amicably herein is self-evident. Over one year, and several medical appointments, passed between the administration of Petitioner's flu vaccine in October 2017 and the first contemporaneous documentation in the medical appointment of Petitioner's left shoulder pain in the fall of 2018. Ex. 26 at 1. Such a large temporal gap – studded with several treater visits, all of which provided occasions to report ongoing shoulder pain - would preclude a finding of onset within 48 hours of vaccination in many cases.

In *this case*, however, the testimony of Petitioner and her husband describing the onset of her shoulder pain, and the reason for Petitioner's delay reporting her shoulder injury, were credible. Ms. DeGeorge established that more likely than not she experienced shoulder pain immediately upon receipt of her flu vaccine on October 6, 2017 – and that embarrassment coupled with a reasonable expectation that it would subside led her to downplay the problem and avoid treatment. Likewise, Mr. DeGeorge honestly and credibly testified that Petitioner had described her shoulder pain to him on the evening of the vaccination. And Petitioner readily acknowledged that she did not report her shoulder pain at her November 21, 2017 MinuteClinic visit. These fact witnesses provided reliable testimony supporting the conclusion that Petitioner's onset occurred within the Table period. In addition, I note that all medical records after Petitioner began seeking treatment for her injury that provide a history of the injury are consistent in placing onset as the time of the October 2017 vaccination.

The February 2018 physical exam record remains difficult to square with such testimony. Plainly it makes *no* mention of any shoulder pain – and as countless Program decisions make clear, it is reasonable to assume that patients report their medical problems to treaters when offered the chance to do so. Medical records that are created

contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras v. Sec'y of Health & Hum. Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993). It is for this reason that the absence of mention of shoulder pain in this otherwise-detailed record was so concerning.

Nevertheless, Dr. Seth credibly testified, consistent with her April 2, 2019 letter, that she did learn of the vaccination-related pain at this time, and she also provided a reasonable explanation for why it was omitted from this otherwise-comprehensive medical record – she did not deem it a sufficient issue to warrant inclusion. Only later (and after when the record reveals Petitioner unquestionably had sought treatment for her injury), when Petitioner's pain was established to have persisted and the matter was brought to Dr. Seth's attention again, did Dr. Seth take the issue more seriously (causing her to willingly offer the letter prepared after this claim's filing). This case thus presents circumstances where the presumption favoring records is reasonably overcome. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Apr. 10, 2013) ("[t]he presumption that contemporaneously created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record" (citing § 13(b)(2)).

Petitioner's delay in seeking treatment for her shoulder, both before and after her February 1, 2018 visit with Dr. Seth, *does* greatly impact the damages potentially recoverable in this case. The largest component of SIRVA damages in a typical case is pain and suffering – and the timeframe in which a petitioner seeks treatment, along with any gaps in her treatment course, are reasonably taken into account when determining damages. *Dirksen v. Sec'y of Health & Hum. Servs.*, No. 16-1461V, 2018 WL 6293201, at *10 (Fed. Cl. Oct. 18, 2018)(indicating that while a delay seeking treatment does not necessarily preclude a finding of causation, it is a factor to be considered when determining the severity of a petitioner's pain and suffering). I would preliminarily deem this a "below-median" pain and suffering case, and urge Petitioner to adjust any demand made accordingly. Regardless, there is nevertheless sufficient preponderant evidence to establish that the onset of Petitioner's pain occurred within 48 hours of her October 6, 2017 vaccination.

## V. Scheduling Order

Accordingly, IT IS ORDERED that **Respondent shall file, by no later than <u>Monday, June 14, 2021</u>, a Status Report indicating his position in this matter given the instant Ruling.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master